845 A.2d 587

STANLEY CLARK, PLAINTIFF–APPELLANT, v. SAFETY–KLEEN CORP., A NEW JERSEY CORPORATION, DEFENDANT–RE-SPONDENT, AND JOHN DOE I, A FICTITIOUS PERSON; AND XYZ CORPORATION, A FICTITIOUS ENTITY, DEFENDANTS.

Argued March 1, 2004—Decided April 8, 2004.

320

*Gary F. Piserchia,* argued the cause for appellant (*Parker, McCay & Criscuolo,* attorneys; *Stacy L. Moore, Jr.,* on the briefs).

*John L. Slimm,* argued the cause for respondent (*Marshall, Dennehey, Warner, Coleman & Goggin,* attorneys).

Justice LONG delivered the opinion of the Court.

In this products liability case, the sole issue before us is whether the expert testimony adduced by plaintiff fell within the witness's sphere of expertise. The Appellate Division held that it did not and invalidated a jury verdict in plaintiff's favor. That conclusion too narrowly interpreted our decisions in *Rubanick v. Witco Chemical Corp.,* 125 *N.J.* 421, 593 *A.*2d 733 (1991), and *Landrigan v. Celotex Corp.,* 127 *N.J.* 404, 605 *A.*2d 1079 (1992), which recognized that the testimony of a non-physician scientist could be admitted with respect to medical causation if the particular expertise or skill of the witness so warranted. Here, a research chemist testified to the effects of cresylic acid on human

skin and concluded that plaintiff's injuries were consistent with exposure to that chemical. Although some individual statements by the expert were improper, the bulk of his testimony rested primarily on the toxicological properties of the chemical, a subject well within his special qualification. We are therefore satisfied that his testimony was admissible and, thus, we reverse.

I

On April 3, 1992, plaintiff Stanley Clark sustained an injury to his finger after using "Carburetor and Cold Parts Cleaner 609" (Cleaner 609) manufactured by defendant Safety–Kleen. In a subsequent Complaint filed against Safety–Kleen in 1994, Clark alleged that Cleaner 609 was "unsafe for its intended use [because it] created an ultrahazardous condition, in that the product was so harsh and caustic that it destroyed and infected the skin on the hands of [Clark], and thereby caused a gangrenous condition to develop. . . ." Clark also alleged that Safety–Kleen had "failed to give [Clark] and other users of the product adequate warning of the nature and extent of the danger resulting from the use of the product." At the heart of those claims was Clark's assertion that the precise chemical formulation of Cleaner 609, which contained cresylic acid,[1] caused the damage to his finger.

A trial was conducted from September 21–27, 1999. Much of the testimony adduced bore on the issue of design defect, which is not before us. Only the evidence relevant to our inquiry will be recounted. Clark testified that in 1992, he was employed as an auto mechanic at Triboro Pontiac in Cinnaminson, a job he had held since 1984. In the course of his work, he customarily performed all manner of automotive repairs, including cleaning

---

[1] Cresylic acid, a mixture of various chemicals including cresols and xylenols, is used as a metal degreaser and as an "agent[ ] for removing carbonization deposits from internal combustion engines." A8 *Ullmann's Encyclopedia of Industrial Chemistry* 25, 46 (5th ed. 1997). Cresols and xylenols burn and corrode human skin. *Id.* at 44, 53.

carburetors. At the time, Clark typically used Cleaner 609 to clean and degrease a carburetor.

Around noontime on April 3, 1992, Clark "removed the carburetor from the vehicle, disassembled it, and placed the metal parts in a metal dip basket. Wearing heavy, large rubber gloves, long sleeves and eye protection, [Clark] submerged the basket in a five-gallon bucket of Safety–Kleen 609." Clark immersed the carburetor components for approximately one-half hour. Still wearing his protective gloves, he removed the parts from the basket and rinsed them with warm water. He then took the parts to his workbench and blew them dry with a compressed air device. Because Clark had difficulty manipulating the small air nozzle on the air dryer in the bulky gloves, he removed the glove from his right hand to operate the nozzle on the air dryer, but kept his left hand (which held the individual carburetor components) gloved. After the parts were dry, Clark removed his left glove with his bare right hand and reassembled the carburetor. He used no other chemical products on that day, or on the preceding day.

A few days prior to that incident, Clark had noticed a small cut on the index finger of his right hand that he was treating with antiseptic ointment and a band-aid. Before April 3, 1992, the cut showed no signs of infection. At around 3:00 p.m. on the 3rd, Clark noticed a tingling sensation in his finger, so he changed the band-aid and ointment to make "sure it was clean." At approximately 8:00 p.m., Clark observed that the sensation in his finger was "a little more persistent" so he cleaned the finger thoroughly with water and hydrogen peroxide and went to bed. At "approximately 11:00, 11:30, [Clark] woke up out of a dead sleep and the pain was excruciating. . . . It felt like somebody holding a lighter to the end of your finger, and there was nothing you could do about it."

Clark went to a local hospital that quickly transferred him to Thomas Jefferson University Hospital in Philadelphia after performing an X-ray and administering antibiotics. That night, his finger was very swollen—in his words, "like a hot dog on [a] grill,"

portions of the finger had turned black and cold, the entire hand had begun to swell, and a red streak could be seen from his finger to the middle of his forearm. On admission to Thomas Jefferson hospital, Clark was diagnosed with a severe finger infection, variously identified in his medical records as "early tenosynovitis" (swelling of the tendon sheath), "finger cellulitis" (an infection of the skin and underlying tissues), and "right index finger chemical infection."

On April 5, 1992, doctors surgically drained Clark's finger, releasing a large amount of clear fluid. That fluid was tested and found to contain a strain of streptococcal bacteria. Doctors decided against immediate amputation, and Clark was released from the hospital on April 10, 1992. The records from Clark's hospital stay contained several diagnoses including chemical infection and streptococcal infection. Later examination "revealed necrosis [tissue death] of the distal portion of his finger," and surgeons had to remove that dead tissue from the end of Clark's finger. After the surgery, Clark was left with very little skin on his right index fingertip. In a third surgery, doctors performed a "thenar flap" procedure, in which Clark's finger was sewn into the palm of his hand so that the skin from the palm would graft to the fingertip. Clark underwent four surgical procedures in all.

The procedures were largely successful but Clark's treating physician, Dr. Lawrence Schneider, "estimated the objective loss of function of the right index finger to be about 35% as an impairment evaluation. This will remain permanent.... [Clark's] actual loss in terms of practical purposes would be somewhat more, about 50% loss of the finger."

Clark experiences pain whenever he uses tools that vibrate, and the finger remains cold to the touch and embarrassing in appearance. He has no sensation for approximately three-quarters of an inch at the tip of the finger. He experiences "a lot of pain" whenever he inadvertently hits or bumps the injured finger "because [his] bone is so close to the end of [his] finger, it's very delicate there." Furthermore, because the injury was sustained

by the index finger of his dominant right hand, Clark "cannot work in his job as a mechanic as he did before, since he can no longer engage in fine motor manipulation, he has difficulty holding and manipulating small objects such as nuts, washers or tools, and he drops things at work." Because Clark is paid on a flat rate per job (rather than per hour), his inability to "work as quickly and obtain payment on the 'flat rate' basis" means that his ability to earn at the same rate as he had prior to the accident was hampered significantly by the injury to the finger. Clark testified at trial that he had read and understood the warnings on the Safety–Kleen label and thus had followed the recommended safety procedures. He was not aware that getting the solvent on a cut on his hand "would result in that much damage."

Dr. Stanley Tocker, Ph.D., a retired research chemist was called by Clark to testify regarding Cleaner 609. Dr. Tocker holds a B.A. in Chemistry from Johns Hopkins University, a M.S. in Chemistry from Virginia Polytechnic Institute, and a Ph.D. in Organic Chemistry from Florida State University. He was employed as a research chemist for Dupont for thirty-seven years before he retired. While at Dupont, Dr. Tocker engaged in research relating to plastics, pesticides, biochemicals, chemical synthesis, and chemical formulation. He worked with both cresols and cresylic acid and observed the damage that cresylic acid could do to human tissue.

In addition, Dr. Tocker was familiar with chemical labeling and "Material Safety Data Sheets" (MSDS worksheets)[2] from his experience in the agricultural products division of Dupont. Clark offered Dr. Tocker as an expert "in the fields of chemistry, the

---

[2] MSDS worksheets are written reports that provide information regarding hazardous chemicals. The United States Department of Labor's Occupational Safety & Health Administration (OSHA) requires "[c]hemical manufacturers and importers [to] obtain or develop a material safety data sheet for each hazardous chemical they produce ...." 29 *C.F.R.* § 1910.1200(g)(1) (1994). They are written in order to "ensure that the hazards of all chemicals produced or imported are evaluated, and that information concerning their hazards is transmitted to employers and employees." *Id.* at § 1910.1200(a)(1).

effects of chemicals and cleaning products on human tissue, ... and the design of chemical products and cleaning products." During *voir dire*, Dr. Tocker admitted that he was neither a toxicologist nor an industrial hygienist, and that he had not personally tested the chemicals in Cleaner 609 on human skin.

He outlined for the court the documents he reviewed in preparation for his testimony:

I reviewed Mr. Clark's medical records. I reviewed the complaint, the interrogatories and answers. I reviewed the deposition of Stanley Clark on February the 22nd, 1995; James Fisher, March the 10th, 1995; Michael Hurley, February the 20th, 1995; Vincent Gallagher, July 31st, 1997. I reviewed reports from Vincent Gallagher of March the 8th, 1996 and John Slimm, July 23rd, 1992. I reviewed the [MSDS] documents and label of Safety–Kleen cleaner 609. I reviewed all the Safety–Kleen literature that was furnished to me. I also reviewed the deposition of Dennis Brinkman, March the 9th, 1999; the Ullmann's Encyclopedia of Industrial Chemistry on Cresols and Xylenols, I also reviewed the report by S.H. Rabinovitz, Ph.D. of Sandler Occupational Medical Associates, July the 25th, 1996, the report by the WARF Institute on skin corrosion tests of Safety–Kleen 609 on rabbits dated September the 9th, 1997.

I also reviewed a great many other documents in my company's library relating to the safety of cresol and the other ingredients in 609. This involved Saks Chemical Desk Reference, Ullmann's Encyclopedia of Chemistry, the Merck Index, Internet documents from the EPA and OSHA. And many other pieces of literature that I found in my library as well as on the Internet.

Dr. Tocker stated that those items constitute the type of record that an expert in his field would rely on to formulate opinions regarding the effects of chemicals on human skin. Dr. Tocker's expert testimony was allowed over defense counsel's objection.

Dr. Tocker first testified to the chemical make-up of Cleaner 609 based on "literature that Safety–Kleen supplied." He explained that the product contains about twelve percent cresylic acid, and about thirty-two percent methylene chloride, as well as dichlorobenzene, surfactants, water, and an alcohol. Those percentages were reflected in Safety–Kleen's literature. Dr. Tocker testified that, in his opinion, "the cause of the medical problems was cresylic acid in the formulation." More specifically, he stated that "swelling of human tissue," "necrosis," "clear fluid in a wound," and "redness" would all be consistent with exposure to cresylic acid. Those conclusions were directly supported by the

MSDS worksheets, the WARF Institute test documents, and *Ullmann's Encyclopedia of Industrial Chemistry.* Dr. Tocker further testified:

> Cresylic acid rapidly penetrates human tissue. It will enter human tissue much faster if the human tissue is abraded or cut. Once it gets into human tissue, it starts destroying human cells and this includes the blood supply to the human cells. And when the blood supply is destroyed there's possibility of necrosis.
>
> Now the thing that indicated to me that the cresylic acid was the key offender here and not methylene chloride or something else is the way Mr. Clark responded. He had a tingling in his finger, not an immediate burning sensation, which is typical of cresylic acid type burns. And then eventually hours later he started having excruciating pain. And this is very typical of cresylic acid. It's not typical of methylene chloride. It's not typical of any of the other ingredients in 609.

The MSDS documents supported that conclusion regarding delayed pain. They observed of cresylic acid that "[p]artial anesthetic properties may mask effects." In Dr. Tocker's opinion, even if a minimal amount of cresylic acid, "below a milligram," came in contact with Clark's finger, it would "cause the kind of damage [that he suffered]."

Dr. Tocker was then asked to consider the label that was placed on Cleaner 609. He expressed the opinion that the warning and instructions were inadequate for a product containing cresylic acid. The label on the five-gallon bucket of Cleaner 609 contained the following warnings:

> DANGER. Contains Cresylic Acids and Chlorinated Hydrocarbons. Harmful or fatal if swallowed—Read Carefully Additional Cautions on Back Panel.

The warnings continued on the back of the bucket are as follows:

> INSTRUCTIONS FOR USE:
>
> 1. Ready to use. It is recommended to use a dip basket with the Safety–Kleen Carburetor and Cold Parts Cleaner.
>
> 2. Immerse Parts. Place metal parts to be cleaned in a dip basket or suspend them from hooks. Lower parts into the solvent. *Do not place hands in the solvent. Rubber gloves should be worn while loading and unloading parts.*
>
> 3. Let Stand. Do not immerse parts for more than one hour without inspection. Inspect for metal deterioration. Parts made with aluminum, magnesium, zinc and copper may deteriorate rapidly if allowed to be immersed too long.
>
> *4. Rinse. When parts are clean they should be thoroughly rinsed with water. Warm water is preferred. Compressed air may be used to blow dry rinsed parts.*
>
> READ–IMPORTANT INFORMATION PRECAUTIONS (SAFETY–INSTRUCTIONS)

1. Use only with adequate ventilation.

2. Do not smoke, drink or eat in work area.

3. Non-flammable. Keep away from sun or heat.

4. Avoid contact with eyes. Will cause irritation and/or pain. Wear protective eye wear.

5. *Avoid any contact with skin. May cause irritation or dermatitis.* Wear protective rubber gloves and clothing.

6. Harmful or fatal if swallowed.

7. Avoid repeated and/or prolonged breathing of vapors. Vapors are heavier than air and will collect in low areas. High vapor concentration can cause dizziness or unconsciousness.

8. Do not mix with other chemicals such as gasoline, fuel oils or detergents.

9. Do not immerse plastic or non-metallic parts. Solvent will attack paint.

10. Do not immerse parts more than one (1) hour without inspection.

FIRST AID (MEDICAL INSTRUCTIONS)

1. Description. Safety–Kleen Carburetor and Cold Parts Cleaner Solvent is a blend of chlorinated hydrocarbons, cresylic acids and surfactants.

2. Inhalation Overexposure. Remove to fresh air immediately. If breathing is difficult, give oxygen. Get medical help immediately. If need be CPR should be given by a qualified person only. Get medical help immediately.

3. Eye Contact. Flush eyes with water for at least 15 minutes. Get medical help immediately.

4. Skin Contact. Remove saturated clothes immediately to prevent skin rash or absorption of chlorinated solvents into skin. Wash thoroughly with mild soap and water and/or baking soda water. Saturated clothes should be washed thoroughly and dried out of doors until the solvent odor is no longer present.

5. Internally–Swallowing. Do not induce vomiting. If conscious, drink large quantities of water. Get medical help immediately.

[(emphasis added).]

Additionally, there was a large red diamond on the front of the label, which read "CORROSIVE" and showed a picture of a test tube pouring a liquid onto both a flat surface and a hand. In each picture, the liquid was making a hole into the object and causing it to emit vapors or smoke.

Dr. Tocker found the label to be inadequate because "there is no admonition about the possibility of a skin problem in writing" on the front of the bucket and the instructions on the back of the bucket do not "say how long the product should have been washed to remove every trace of cresylic acid. . . . There should have been some indication how long the product should have been washed to

be sure that when the product was removed from the sink, it was safe to handle."

Dr. Tocker also testified that the label violated standards promulgated by the American National Standards Institute (ANSI) which provide that labeling should include information in a prominent way about the *exact* effects one can expect from the toxic ingredients present. "It's not adequate to say something's an irritant. One has to say how much of an irritant or what kind of organ is affected."

Of particular concern, Dr. Tocker noted, was that "cresylic acid and two of the other ingredients are insoluble in water and difficult to remove by water," so that during the rinsing process "some 609 [would] remain[ ] on the carburetor, and then when the carburetor is subjected to an air stream, it would remove the volatile part of the formulation which is methylene chloride, and water.[3] Leaving behind a higher concentration of cresylic acid and dichlorobenzene." Thus, rinsing the carburetor and blowing it dry does not guarantee that it will be safe to handle. Dr. Tocker also testified that if Clark removed his left glove with the ungloved and cut right hand, as he testified that he did, that exposure alone would have been sufficient to cause severe damage to his finger.

On cross-examination, Dr. Tocker acknowledged that although the Thomas Jefferson Hospital summary identified Clark's principle diagnosis as "right index finger chemical infection", it did not contain any reference to Cleaner 609 or to cresylic acid in general. On redirect examination, Dr. Tocker explained that the hospital's failure to mention the precise chemical that injured Clark was "probably" because the hospital would not "have [had] chemical analytical equipment to determine the nature or the chemical

---

[3] The volatility of a chemical is a measurement of its tendency to evaporate. Both water and methylene chloride (which, together, make up about 40 percent of the Cleaner 609 compound) would evaporate faster when subjected to an air stream, than would the less volatile (and more corrosive) chemicals.

composition of an irritant that gets into an open wound. They don't have high performance liquid chromatography, spectrographic equipment or anything like that."

Dr. Tocker also was questioned on redirect examination about the dual diagnoses that seem to have been made in some of the hospital records, showing both a chemical injury and a bacterial infection. Over defense counsel's objection, and after the trial court asked Dr. Tocker if he felt "qualified to answer" the question, the court allowed Clark's attorney to ask if it "would [ ] be unusual to have a secondary diagnosis of streptococcus infection after a principal diagnosis of right index finger chemical infection?" Dr. Tocker answered: "Once the tissue in the human hand is opened, and the chemical irritant had an opportunity to operate in the open wound, the open wound was very susceptible to infection by bacteria, any kind of bacteria, strep, staph, anything."

Dr. Lawrence Schneider, Clark's treating physician at Thomas Jefferson Hospital, also testified on his behalf. Safety–Kleen's counsel moved twice before trial to bar Dr. Schneider's testimony on the ground that it was based on "unaccepted scientific methodology and inadequate data" and that it was not based on the facts. Both motions were denied. At trial, Safety–Kleen again moved to bar Schneider from testifying because his written report, summarizing his treatment of Clark, opined that the injury to Clark's finger was consistent with the solvent's being injected into the finger from a pinhole in a pressurized spray gun. Safety–Kleen argued that, although it is uncertain how the injury to Clark was caused, he never sprayed the Cleaner 609 out of a pressurized hose.

The trial court ruled that, although Dr. Schneider had initially made an erroneous assumption regarding the mechanism of injury, that assumption was not material to the conclusions that Dr. Schneider made, and that "[i]t's a distinction without a difference or a difference without a distinction whether the solvent entered the finger as a result of high pressure. . . . It really doesn't make a

bit of difference." The court further stated that any shortcomings in Dr. Schneider's testimony went "not to admissibility but to credibility and the jury can hear his opinions . . . ."

Dr. Schneider testified that he is an orthopedic surgeon specializing in hand surgery. He has extensively studied and written on high-pressure injection injuries to the hand. Dr. Schneider first examined Clark in the emergency room on April 4, 1992. When Clark failed to respond to antibiotics, Dr. Schneider decided to surgically explore the finger. During that surgical procedure, he testified, "we found a lot of clear fluid throughout the soft tissues of the finger, . . . [The fluid] did not look like puss or the kind of material you see with an infection." When asked whether "that clear fluid [was] consistent with a chemical solvent," Dr. Schneider answered "Yes." Dr. Schneider also testified that in his opinion, to a reasonable degree of medical certainty, Clark's injury had all the appearances of chemical toxicity "causing this gangrenous condition at the tip of the finger."

On cross-examination, Safety–Kleen's counsel noted the apparent contradiction between Dr. Schneider's testimony and the summary letter he had earlier written to Clark's counsel regarding the case. Dr. Schneider's letter to Clark's attorney stated: "[Clark's] injury had much of the characteristics of a high-pressure chemical injury to the distal end of his right index finger. At surgery there was clear fluid demonstrated in the pulp of his index finger, which we presumed was a chemical solvent." However, after it had been pointed out to Dr. Schneider at his *de bene esse* deposition that there was no high-pressure injection of the solvent into Clark's hand, he clarified:

> [T]he thing that made me suspect [injection] in the beginning was the intense pain that [Clark] had and the sudden onset, which really goes along with some kind of reaction like that. My presumption was that it was injected. It may not have been, but *with the cut there it could have had the same effect.*
>
> [(emphasis added).]

Dr. Schneider concluded that "there's no question in my mind" that Clark's injury resulted from exposure to a chemical solvent.

Safety–Kleen called Dr. Scott Jaeger, an orthopedic surgeon and hand specialist, who evaluated Clark briefly prior to the trial. Much of Dr. Jaeger's testimony went to the severity of Clark's injury and his level of disability, subjects not at issue before this Court. Dr. Jaeger concluded, based on a review of Clark's medical records, that "the characteristics of the wound and the descriptions by the physicians at Jefferson [were] not typical of one that was made worse by a corrosive substance such as cresylic acid . . . ." In fact, Dr. Jaeger stated that

it was quite clear that the patient had a cut in his finger which was relatively shallow associated with a callous. It became infected with the strep bacteria. His—the course of what happened to him is very, very classic in that at first he felt some tingling at the fingertip, but then as the bacteria got to that tendon sheath, it immediately had access to the whole finger 'cause once you get into that tendon sheath, the bacteria can move very rapidly into the entire finger, and it causes tenosynovitis which is an emergency because if you don't release the fluid that has the bacteria in it from that sheath, it can cause the finger to totally freeze up, and then he had a red line up his arm. So what happened is that the strep got into the fingertip through this little crack and then moved very rapidly down the finger and caused necrosis of the tip of his finger, actually ate up the tip of his finger, . . .

Dr. Jaeger went on to state that

if the cresylic acid were the cause of the bacteria getting into this tendon sheath . . . you would need a fistula that was conical shaped showing where the original cresylic acid got into the split [in the skin] . . . it would have had to have eaten a hole in the skin which would have been larger at the surface and bored its way down into the place where the sheath is.

Dr. Sheldon Rabinovitz, M.D., testified for Safety–Kleen as an expert in industrial hygiene and toxicology. Dr. Rabinovitz opined that the Cleaner 609 label "more than met the requirements of the OSHA hazard communication standard" because the words used on the label, the description of adverse effects, and the identification of the product's contents were all sufficient to warn the potential consumer. Dr. Rabinovitz also testified that, based on a review of this case and Clark's medical records,

it is not possible for sufficient amounts of the cresylic acid to have gotten into his finger to have caused any harm. The reason for that is primarily if for no other reason this carburetor was dipped in water following the cleaning. And so when he was applying the air pressure to the carburetor, what he was primarily cleaning was water. There might have been a very minor amount of cresylic acid in there, but very, very low.

Dr. Rabinovitz acknowledged that both OSHA and the ACGIH (American Conference of Governmental Industrial Hygienists) standards state there should be *absolutely* no contact between the skin and cresylic acid because of its corrosive effect. Dr. Rabinovitz also agreed with Dr. Tocker that cresylic acid (as a component part of the solvent) is absorbed readily into the skin, and "if [the skin is] cut it's even worse." His exact words were "[c]resols are different, because even when the skin isn't cut it can get in. But if the skin is cut it's going to get in even easier." Dr. Rabinovitz also indicated that, in his opinion, Clark would have experienced immediate pain if his finger had been exposed to cresylic acid.

Dr. Dennis Brinkman, the Director of Technical Development for Safety–Kleen testified to the constituent elements of Cleaner 609, verifying Dr. Tocker's testimony on that subject. He stated that the product was made to military specifications and also identified the MSDS worksheets for the product that are provided to customers. Those sheets underscore the corrosive effects of cresols and the control measures (*e.g.*, gloves, eye-protection) that users are instructed to employ. According to Brinkman, the constituent elements of Cleaner 609 are all "found throughout nature .... in plants, flowers [and] trees." However, Brinkman acknowledged the corrosive effect of cresylic acid and agreed to the volatility and solubility conclusions of Dr. Tocker—that as the methylene chloride evaporated during the air-blowing phase of a carburetor cleaning, it would leave behind a higher concentration of cresylic acid.

Additional evidence that was submitted to the jury without objection included photocopies of the Cleaner 609 label that Clark had read, reports from the WARF Institute regarding the corrosiveness of Cleaner 609 as shown in tests on rabbits, technical information about Cleaner 609 and its component compounds from MSDS worksheets, and *Ullmann's Encyclopedia of Industrial Chemistry*.[4] Clark's medical records were also submitted.

---

[4] The first MSDS report clearly indicated that because Cleaner 609 contains cresylic acid, it is a health hazard to skin and "is corrosive to living tissue."

The jury returned a verdict in favor of Clark, finding that Cleaner 609 was defectively designed and that there was an inadequate warning on the product, which proximately caused Clark's injury. The jury awarded damages in the amount of $400,000. Those damages included stipulated medical bills of $34,812 and net lost wages of $12,000. Judgment in favor of Clark was entered reflecting the jury verdict.

Safety–Kleen moved for judgment notwithstanding the verdict, for a new trial, and for remittitur. The trial court denied those motions although it acknowledged that "some of the calls were close and I made them as best as I could at the time of trial."

Safety–Kleen appealed the judgment and the denial of the post-trial motions. The Appellate Division reversed. In so doing, the court ruled that the requirement of proving the existence of a feasible alternative design was not met and, therefore, Safety–Kleen's motion for a voluntary dismissal of Clark's defective design claim should have been granted. That issue is not before us.

Regarding medical causation, the court focused on Dr. Tocker's testimony. In the Appellate Division's view, some of Dr. Tocker's testimony, namely, the chemical composition of Cleaner 609 and the chemical properties of cresylic acid, was perfectly appropriate. However, his testimony related to "medical diagnoses, discussions of bacterial infections and comments on hospital analytical equipment" was found to be more troubling.

Those conclusions were supported by the WARF Institute's tests on Cleaner 609. Likewise, the second MSDS report denominated Cleaner 609 as hazardous to skin, declaring it "[c]orrosive to living tissue and ... rapidly absorbed through the skin causing systemic poisoning. Contact with unprotected skin can cause discoloration, irritation, blistering and slow healing chemical burns. Partial anesthetic properties may mask effects." *Ullmann's Encyclopedia* stated that "cresols [cresylic acid] burn the skin and mucous membranes through degradation of proteins, similarly to phenols. Initially white, and later brownish black necroses appear on the skin." *Ullmann's Encyclopedia, supra,* at 53.

The Appellate Division concluded that, although the trial court "did not commit manifest error in qualifying Dr. Tocker to testify about chemistry, warnings, and labeling," "allowing Dr. Tocker to testify to medical causation was beyond the scope of his qualifications as a research chemist. The judge's decision to admit this testimony was a mistaken exercise of discretion."

The Appellate Division also addressed Safety–Kleen's argument that "Dr. Schneider's testimony, concerning medical causation, should not have been admitted because it was based on an incorrect factual premise and a flawed theory of causation." The court held that "[t]he primary basis for Schneider's opinion, the clinical appearance of plaintiff's injury and its response to treatment, was not undermined by the revelation that plaintiff was not working with a high pressure spraying apparatus. For that reason, the trial judge properly allowed Dr. Schneider's testimony on causation."

Despite the fact that Schneider's medical causation testimony was admissible, the Appellate Division nevertheless determined that the jury's conclusion on that element of the failure to warn claim was fatally flawed by the wrongful allowance of Dr. Tocker's causation testimony. We granted Clark's petition for certification, "limited to the issues arising out of the alleged failure to warn and medical causation." 174 *N.J.* 42, 803 *A.*2d 637 (2002).

## II

Clark argues that the Appellate Division's reversal and remand on the inadequate warning claim was improper because Dr. Tocker's qualifications in organic chemistry, his personal familiarity with "the medical damages that occur from exposure to cresylic acid," and the specific research he conducted in preparation for his testimony qualified him to testify on the effects of cresylic acid on the human body. Further, Clark contends that to the extent that Dr. Tocker's testimony exceeded his expertise, the error was harmless because Dr. Schneider fully corroborated his conclusions.

Safety–Kleen counters that the Appellate Division's reversal of the failure to warn determination based on the admission of faulty medical causation testimony was correct, and consistent with our prior jurisprudence. More specifically, Safety–Kleen contends that Dr. Tocker's testimony regarding the method by which the chemical reached Clark's finger, as well as his failure to test the precise compound of chemicals in Cleaner 609, led to impermissible jury speculation. Moreover, Safety–Kleen criticizes Dr. Tocker's testimony regarding whether it "would [ ] be unusual to have a secondary diagnosis of streptococcus infection after a principal diagnosis of right index finger chemical infection." According to Safety–Kleen, Dr. Tocker's answer to that question "was a key element in the case where the court was permitting a non-medical doctor who possessed no specialized expertise in bacteriology, toxicology, medical diagnoses or clinical technology to offer an opinion on the key issue in the case." As a result, Safety–Kleen argues that "that testimony prejudiced the defense and mislead the jury." According to Safety–Kleen, "[t]hat trial error had the capacity to, and did taint the entire verdict since it allowed the jury to speculate on causation."

## III

In a products liability case, the duty to warn is premised on the notion that a product is defective absent an adequate warning for forseeable users that "the product can potentially cause injury." *Coffman v. Keene Corp.*, 133 *N.J.* 581, 593–94, 628 *A.*2d 710, 716 (1993) (citing *Freund v. Cellofilm Props., Inc.*, 87 *N.J.* 229, 242, 432 *A.*2d 925, 931–32 (1981)).

Ordinarily the resolution of an inadequate-warning products liability claim involves first the determination of the defect in a product sold or marketed by defendants, *i.e.* the evaluation of the adequacy of the warning, then an assessment of the plaintiff's conduct, and finally a determination of how each may have proximately caused the accident.

[*Vallillo v. Muskin Corp.*, 212 *N.J.Super.* 155, 158, 514 *A.*2d 528, 529 (App.Div. 1986), *certif. denied*, 111 *N.J.* 624, 546 *A.*2d 540 (1988).]

The defect alleged here was the presence of cresylic acid in Cleaner 609 without an adequate warning. The gist of Clark's

claim was that he was injured by the cresylic acid in the product. The question presented is whether Dr. Tocker could testify about that injury.

In the past, we have held that non-physicians may testify regarding medical causation if the circumstances warrant it. In initially laying out a guideline to govern such testimony, we established that

> a reliable expert opinion on the lifesaving potential of emergency first aid services can be given by a witness whose competence as an expert in this field is demonstrated by education, training or experience, and that a professional license or degree in medicine is not a prerequisite to establish sufficient knowledge to qualify as an expert. Accordingly, plaintiffs should be permitted to demonstrate that their witness has the requisite specialized knowledge, training or experience to qualify as an expert.
>
> [*Hake v. Manchester Twp.*, 98 *N.J.* 302, 306, 486 *A.*2d 836, 838–39 (1985).]

That principle was expanded to embrace more explicitly the medical causation testimony of research scientists in *Rubanick, supra,* where the Court found that a research biochemist was qualified to give expert testimony that polychlorinated biphenyls could cause colon cancer. In that case, we affirmed the Appellate Division's holding that "by virtue of [the expert's] specialization and research background in cancer [, the expert] was more qualified than a medical doctor who is involved with the care and treatment after the fact of cancer development in patients ...." 125 *N.J.* at 452, 593 *A.*2d at 749. Our only caveat was that the expert's conclusion derive from a methodology that is supported by some consensus of experts in the field. *Id.* at 449–50, 593 *A.*2d at 747–48. *Rubanick* changed the focus of the inquiry from the scientific community's acceptance of the substance of the opinion to its acceptance of the methodology and reasoning underlying it.

In a subsequent case involving an asbestosis claim, we remanded with instructions that the trial court provide a hearing on the issue of whether a non-physician epidemiologist was sufficiently qualified to offer causation testimony regarding a particular plaintiff's colon cancer. In so doing, we found it instructive that "[c]ourts of other jurisdictions also permit non-physician

scientists to testify on matters of individual causation when their training and experience indicate sufficient expertise to support a reliable opinion." *Landrigan, supra,* 127 *N.J.* at 423, 605 *A.*2d at 1089. In other words, the admissibility of expert testimony will depend on the facts and on the expert's qualifications. More particularly, the expert must be sufficiently qualified by education, knowledge, training, and experience in the specific field of science. He likewise "must possess a demonstrated professional capability to assess the scientific significance of the underlying data and information, to apply the scientific methodology, and to explain the bases for the opinion reached." *Id.* at 414, 605 *A.*2d at 1084 (citing *Rubanick, supra,* 125 *N.J.* at 449, 593 *A.*2d at 748).

## IV

■ We turn now to the facts of this case. Dr. Tocker was offered specifically as an expert in "chemistry, the effects of chemicals and cleaning products on human tissue, warnings regarding chemical products and cleaning products, and the design of chemical products and cleaning products." The Appellate Division agreed that he was well qualified to offer an opinion on the chemical composition and chemical properties of Cleaner 609 and cresylic acid and on the issue of the sufficiency of the warnings and label. At issue is his testimony regarding the basic toxicological effects of the chemical on human skin.

It seems clear to us that Dr. Tocker's education, experience, and research broadly qualified him to address the subject of the effect of cresylic acid on human skin. The chemical properties of such a solvent is a subject uniquely within a chemist's expertise and it is those chemical properties that essentially determine the toxicological and occupational health effects of a product.

Dr. Tocker was not a substitute for a medical witness. Dr. Schneider performed that function. However, because Schneider could only testify to Clark's "chemical" exposure, it was for Dr. Tocker to link Clark's testimony regarding the use of Cleaner 609 and cresylic acid exposure to the symptoms reported by Clark and

verified in the medical records. That was well within the margins of his expertise.

Moreover, he testified to the scientific materials that he consulted in preparation for the case and stated that they were the types of data an expert in his field would rely on in formulating an opinion. Indeed, that documentation was made up of the same materials relied on by the defense experts, and plainly established the corrosive effects of cresols on skin. In short, Dr. Tocker's conclusions regarding the effects of cresylic acid on human skin were not only reached by a method accepted in the scientific community, but his very conclusion essentially was uncontroverted. Likewise, his conclusion that Clark's injury was "consistent" with such chemical exposure was identical to the conclusion of Dr. Schneider whose testimony was properly admitted by the trial court.

However, we recognize that the fact that Dr. Tocker was generally qualified to address the issues in the case does not mean that every word out of his mouth was appropriate. Indeed, Safety–Kleen advances several specific arguments addressing particulars of Dr. Tocker's testimony, which it claims tainted the outcome here. The Appellate Division reached a similar conclusion.

■ We turn now to those specifics. Safety–Kleen argues that Dr. Tocker's opinion about how the cresylic acid got onto Clark's skin was speculation. That argument misconstrues Dr. Tocker's testimony. Like any expert, his opinion was based on the facts in the record. Included among those facts was Clark's uncontroverted statement that he removed the glove from his left hand with his ungloved and cut right hand. Dr. Tocker specifically stated that he understood those to be the facts. Those facts, in turn, supported Dr. Tocker's conclusion regarding Clark's exposure to cresylic acid as consistent with his symptoms. That testimony was fully admissible. See *Vuocolo v. Diamond Shamrock Chems. Co.*, 240 *N.J.Super.* 289, 300, 573 *A.*2d 196, 202 (App.Div.1990)

(holding that expert opinion may only be admitted if it is based on proper factual foundation).

It is also argued that Dr. Tocker's testimony that hospitals do not typically have access to chemical apparatuses is problematic. We conclude that that testimony arguably was admissible because a research chemist could be expected to know which machines typically are used to perform tests to identify a particular chemical compound, and the kinds of institutions that have access to such highly specialized equipment. But even if that was not the case and the statement was rank speculation, it was harmless overall because the reason why the hospital did not test for cresylic acid essentially was irrelevant. Although the dual hospital diagnoses referred to streptococcal infection and to chemical exposure, it is uncontroverted that no chemical test took place and that there is no "scientific" proof of cresylic acid in Clark's finger. That is the point underlying the defense. Thus, any error in the admission of Dr. Tocker's explanation was inconsequential.

Finally, Safety–Kleen urges us to conclude that Dr. Tocker's testimony that it was not "unusual" for streptococcal infection to follow upon chemical exposure requires reversal. Obviously, that kind of conclusion was beyond Dr. Tocker's ken. However, in context, we view his isolated statement as nothing more than an iteration of the commonly accepted notion that wounds are breeding grounds for infection, and we believe that the jury understood it as such. In fact, what Dr. Tocker said was just that: "the open wound was very susceptible to infection by bacteria, any kind of bacteria, strep, staph, anything." Given the dual diagnoses in the hospital, the potential for infection and chemical exposure to coexist is obvious. It was for the jury to assess which was more likely to have been the precipitating cause of Clark's injuries. In short, we are satisfied that nothing in Dr. Tocker's testimony could have tainted the jury's deliberations.

That is not to suggest that Dr. Tocker's opinion would not have benefited from some more careful curbing. However, we are satisfied that the brief portions to which we have adverted were

either admissible or harmless in light of the real issues in the case, and that the reversal by the Appellate Division based on that testimony was unwarranted.

## V

The judgment of the Appellate Division directing that a new trial be held on the failure to warn claim is reversed. The matter is remanded to the trial court for the reinstatement of the verdict.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN, and WALLACE—7.

*Opposed*—None.